at all. Arguments not to exceed 15 minutes per side. Mr. Wiest, you may proceed for the appellants. Good morning, Your Honor. Chris Wiest for the appellants. We have respectfully requested four minutes for rebuttal. Your Honor, as this case comes to this court on both a motion to dismiss and a denial of appellants, I would like to ask Mr. Wiest to come forward for a preliminary injunction, and it involves a set of facts where the defendants in their process are permitted to record. They selectively did so. They were turning off the recording in the middle of that process, creating, frankly, a false narrative. And when the plaintiffs attempted to record, they were forbidden from doing so. I think the false narrative part of the case is over, right? In other words, now we're just about can you record? Your And we disagree with that because the same problems that arose are still there. The defendants are, first of all, they were never permitted to selectively record. They did so anyways. And the entire point of the plaintiffs attempting to record was to catch them in the act of that misconduct, which was prohibited under the city code to begin with. The city code indicated, hey, you've got to record these interviews. They weren't doing all of that. And yes, there was this, the union grieved it. They promised to record. But again, they were required to do that from the outset of this case, and they failed to do so. That's what prompted. Is there any allegation that they've gone back to their old ways? I think we have to take the complaint as a given, right? It seems like you just suggested in response to Chief Judge Sutton that they are, again, recording and stopping recording during exculpatory information. I assume there's no allegation of the complaint that they're The allegation of the complaint was that they were selectively recording, and that process had not stopped. Nobody asked. But then you filed a union grievance. The union grievance led to the, you can't selectively record. And my question is, have they been violating the order, or the settlement, I suppose it was, that you have to record the entire interview? Your Honor, that's not in the record, because obviously that all occurred after the filing of the original complaint. And so that was, those allegations are not in the record. The allegations that are in the record of the complaint simply indicates that they were selectively recording. We did not get into any of the subsequent information, nor frankly. I think it might be healthy for the argument for both, let's just focus on the right to record. Yes, Your Honor. Let's just stick with that. Your Honor, we believe that there is a right to record. We think that this case law suggests as much. And I think one of the cases that we cite is the Bobby v. American Broadcasting Corporation case that was a 1989 case out of this case, out of this court, 8182-267. In that case, this court invalidated, at least on an as-applied basis, the federal wiretapping statute as applied in news gathering. And it did so recognizing that, a couple of things that I think are relevant here. One, it's unlikely to unmoor the act of recording with the act of dissemination. In other words, this court recognized that the act of recording is a precondition, if you will. So how about thinking about, you know, I realize this investigation is not like a grand jury in lots and lots of ways. So I appreciate that point. And so don't answer by saying how different a grand jury is from this. All right? I already got it. I feel like I've seen that a lot recently. What I'm struggling with is it's still an investigation. That's the point, right? And there's some virtue with investigations of whether you record or not, whether you have a transcript or not, that you keep it quiet, right, until the investigation is done. And then you might have different rules of what you could say happened during the investigation, whether you recorded or you kept notes or your memory, whatever it might be. That's what I'm struggling with your side of the case. This just seems to have the features of, this is a very important investigation, right? We know this issue is highly consequential. That's why the city created this agency and makes a lot of sense. It's a place for citizens to go. And I would think for your clients, it's a pretty good idea to have this confidential until the findings are, there's a conclusion. So why, you know, and you guys acknowledge that if you recorded, you might release it before the end, right? I take it that is one option you think you have. And I'm just trying to figure out why doesn't that undermine the investigation in the way it would undermine a grand jury or any other investigation? Your Honor, they permit note taking. And so there's President Hills, who's in the audience today, from taking notes about everything that occurs and going out and disseminating it. So there's no grand secret like there is in a grand jury scenario where everything is hush-hush. That just isn't the way that these are done. And so the notion of somehow they're going to say... Is there a rule about releasing the information from your notes? There's not. So everything can be public? It can be. And so, and that gets really into this lesser inclusive measures and less restrictive means. One of the things we suggest in our brief, and they never address it, is if secrecy is your governmental interest, if protecting the integrity of the investigation is your governmental interest, well then why not put a gag order on until the end of the investigation? And the CCA can release their recording, and then the President of the Union or the officers that are being investigated can release their recording. And if they don't match up, then something's rotten in Denmark. And they don't allow that. And they never explain why. And it would seem to me, if you take them at their face in terms of what their governmental interests are, I think they said it was ensuring an orderly investigation, in other words, not interrupting the interview itself, and maintaining the integrity of the questioning and the investigation, then why not a gag order until the close when they release the audio of these? And that's the other thing, Your Honor. Unlike a grand jury investigation where usually those are secret for very long periods of time, unless there's something, you know, that gives rise to looking at them, here these audio recordings are made available to the public at least by the conclusion of the investigation. And so at that point, query whether or not there's any interest they have, if they're releasing the audio, in not permitting these gentlemen to make the recording. So is the concern in not preventing the recording, is part of the concern the possibility of manipulation with the people recording in there and creating a distorted record, if you will, of what happened? That's the paramount concern, Your Honor. Okay. And so why isn't that a legitimate concern? You're suggesting why their concern on the other side of this? Right, right. Their concern about the officers doing, you know, recording in the chamber. I know the officers were complaining that we need to record because they're starting and stopping in their gaps. Right, the officers should be manipulated. And now, you know, under the agreement, there's not supposed to be that stopping and starting. And you have no evidence that that has, that they're violating that agreement. Your Honor, I guess what I would say is it's not in the record at this point. And if we need to amend to allege that, we're happy to indicate that that is going on in some instances still. But the problem is, again, I mean, you're still, the possibility of these officers saying to the CCA, you're selectively recording, and here's our notes. And the CCA comes in and says, well, here's our notes and here's our recording. I suppose it goes both ways, but usually sunlight and more information is better than not. And for a long period of time, this lack of manipulation was the standard, you know, there wasn't this question of the CCA manipulating things. Obviously that happened. And that happening gave rise to this lawsuit. And there's no indication, I guess what I would say is there's no indication on this record that that is not still the case. And the only indication in the record is that that was the case, that there was a selective recording by the defendants, particularly on the motion to dismiss standard, which looks at our complaint and the allegations in it. And the district court found that we, I guess, failed to state a claim. And what I would say back to that is we believe there is a right to record. What about, I'm sorry, just this one thing. Chief Judge Sutton mentioned the contrast and comparison between grand jury proceedings. But let's look at some other types of interrogations. In voluntary police interviews, usually the person being interviewed by the police is not permitted to record that. So, and not make independent recordings. So why, if the person can't do that in that voluntary police interview, and they can certainly say there's a value to being able to do that, but we sanction this, having the interviewee not be able to record. Why isn't that similar here? I mean, contrast and compare the rationale for the two. Your Honor, I'm not sure that in a voluntary police interaction there isn't a right to record. Particularly in light of development case law, most of which we've cited, that talks about these interactions and the ability to record the police. And the fact of the matter is these officers, at least in Cincinnati, they wear body cameras. If those cameras are turned off, if those cameras are... I'm talking about the interview where the person is in the station house being interviewed. And Your Honor, those are videoed in Cincinnati as well. And so there's no such thing as, from what I understand, there's no prohibition for a suspect being able to turn on his phone. Particularly if it's a voluntary interview, just as these officers have requested to do. In part, we think, that prevents corruption or its appearance. Sunlight is the best disinfectant, as Justice Brandeis has indicated. And there is an evolving body of case law, not so much necessarily in this circuit, and I'm happy to discuss SHARC on rebuttal, because I see that I'm running out of time. But there is this evolving line of cases from other circuits that suggest that, yes, you have a fundamental First Amendment right to record the government. Before your time is up, can I ask just what the consequences... So it's a ban on recording. Suppose you come in and say, I'm going to record. What is the consequence of violating the ban? It's not a criminal prohibition, is it? Is it just the officer may end up losing his job? Is there any other consequence? That's correct. Your Honor, he may end up losing his job. The CCA will stop the interview process, make its findings without the officer's side of the story. That then goes up to the city manager. It could be the result of corruption. Why isn't the right way to think about this just a condition of employment? So my law clerks can't video our confidential conversations, because I make it a condition of employment that they cannot. And I would think everybody would think that's perfectly constitutional, because in order for the government to function, you need confidentiality. The consequences is not a criminal prohibition. It's just you lose your job. Why isn't this just like that? So there's even less protection here than, say, a criminal prohibition. Like, I think in Alvarez, it was a criminal prohibition. Like, if you record the officer, you could get punished for it. Here, it's just, OK, well, the officer loses the job. Three responses to that, just briefly, Your Honor, and then I see that I'm out of time. First, it's still a government restriction on speech, even though it is a government employer. Second, even in the employment context, we're not only dealing with employees, we're also dealing with their representatives, their attorney, or possibly the union president, that this restriction extends to. So it does extend beyond the employees themselves. And third, this restriction applies to anybody that's being interviewed by this body. Of course, in this context, it's the police. But they may very well also be selectively recording other members of the public that they're taking statements from. So it's not merely a restriction on employment. They're supposed to be. As to this case, it is. Your Honor, well, in terms of these plaintiffs and their gripes, that's correct. But on a more broad basis, it would not be correct, because the restriction, you know, extends beyond that. OK. Thank you. Good morning. May it please the Court, my name is Scott Heenan. With Warren Mai, I represent the Community Complaint Authority. All of the cases that they're talking about, this right to record, are based off of things that happen in public. And as Judge Donald, Judge Murphy, as both of you have pointed out, if it's a police interrogation room, if it's in your chambers, honestly, if it's in this courtroom that we're in right now, one of the first things that we were told this morning by the clerk is, you're not allowed to record in here. I think I must have been wrong. I was thinking you did have a secrecy incentive here. I take it secrecy is really not on the table, because these interviews can be public. So in other words, if the union representative is there taking notes, interview is done, he would be allowed to go to the local news station and say, hi, I was just there. It's quite clear this officer did everything by the book. Here's what he said. That would be OK? That wouldn't be punishable? No, that would not be punishable. So there's no secrecy. So all the grand jury cases where secrecy really is important. So what is the point? If you can take notes, you can tell the world the conversation, why not make what you're telling the world completely accurate in this day and age where technology can be brought anywhere? I think a good comparison would be separation of witnesses during a trial. Nothing prevents the people who are in the audience of that trial from taking notes and going out and talking to people. They're not supposed to talk to witnesses, but the news media often will be there with permission, and news will come out about those trials. Same thing happens in the CCA interview room, where someone is allowed to take notes. They are allowed to then use those notes however they want. CCA just says, you are not allowed to make your own independent recording. You're not allowed to come in here with recording devices, whether it's your cell phone, a camera, whatever. That's them controlling their environment. And there's no First Amendment right to do whatever you want just because you happen to be someplace. They cannot walk into that CCA room and say, well, I have a right to be here, so I get to do what I want. And again, going back to all the cases where they're saying that, well, people are allowed to record us, and we have body-worn cameras, and we're recording what's going on. But you still have to have a government interest. I'm trying to figure out what the government interest is, and the separation of witnesses, I don't know. You take all these notes, and the union representative, if this is your suspicion, I'm just not sure how your current policy really advances that. Well, again, it goes back to when we look at SHARC, does this selectively delimit the audience? And it does not. The recording policy applies to everyone universally. No one that's in the CCA is allowed. But I think Chief Judge Sutton's point is, would it even survive rational basis review? Absolutely. We can go to the district court, who told us all the reasons. I believe it's 186.27 of the record. It's to maintain order. To ensure what's discussed in the interview room is not improperly broadcast. To be sure that whatever's being discussed in the CCA review room is not being improperly used to influence the testimony of others. You could bring a stenographer in that can capture every word. You could bring a stenographer in that can capture every word. No, you would not be allowed to. The only people who are allowed in the CCA interview room... What if the union representative is really good at this? A former stenographer becomes a union representative. You're going to say, hey, you're writing a few many things down. They're not going to say that. No, they wouldn't. Can we sit here today and perhaps come up with better policies? Sure. I'm sure we could. But the thing is that we're not here to come up whether or not there's a better policy. We're here to see if it's rationally related to the CCA's stated purpose. And as the district court found, it is. What's your response to... I think this is supposed to be a helpful question for your side, but I'm not sure you're even arguing this. He's making the point that it's a condition of employment, and that takes you down the road. It's really government speech, and that's not really protected, but I'm not sure you're arguing that. As a condition of employment, officers do have to appear before the CCA. They have to do that as a term of their employment. No, no, no. It's a condition of employment that you do it in a certain way. Not that you have to appear, but that you have to appear in unrecorded settings. I don't think that we reached that when we were discussing this below, mainly because we were looking at, at that point it might become a situation where it would delimit the audience, because if we treat the officers somehow differently than the citizens who come in to speak, that might run into an issue. What is the consequence? So I assume that if somebody shows up and publicly says, I'm recording, the consequence will just be you won't hold the interview? The consequence was they do not do the interview. And what happens if they secretly record? Would there be a consequence of any type of criminal punishment, civil fines? It would be essentially nothing, right? In the employees, there are city administrative regulations related to what city employees may or may not do. Yeah, but so for the city employees, they could get punished. I recognize that, but the punishment will just be potentially a suspension or losing, they'll be personnel related, employment related. So it strikes me, I don't understand why this just isn't like any other condition of employment on speech condition, which I think is generally, the court has distinguished restrictions on speech in the employment context from restrictions on speech in the public context and finds it much more troubling for the government to fine or criminally punish somebody for speech than just to lose your job for speech. And so it seems to me that that might even be a more helpful framework to you if this was under kind of Garcetti or Pickering balancing. And we had addressed that to some degree below in the motion to dismiss, but the trial court did not go down that path. So that argument is not really before you today because that's not the grounds. Something called affirmance on alternative grounds? You could. You could. You could find the trial court was right for a wrong reason. There's nothing to prevent you from doing that. The hardest part about this case is just the doctrinal framework in which we should put it in. So that's one framework. Do you think that it's really analogous to cameras in the courtroom since courtrooms are public forums, or at least forums, and so that implicates forum analysis? I assume that forum analysis would not be appropriate here because you don't view the interview room as a forum? We do not. Okay. So then the case law on cameras in courtrooms is simply inapplicable, right? I was trying to find case law that would be closely on point. I was having a hard time finding it because, to use Judge Donald's example, I don't know that I've ever had found a case where someone tried to go into a police interview interrogation room and said, hold on a second, I want to record things on my phone. I've never seen that happen, and I'm pretty sure if that did happen, if someone walked into the interview room and tried to do that, they would not get very far with that. And that's because, you know, could the police allow that? Absolutely. They could absolutely allow it if they wanted to, but they have control over that room, just like the CCA has control over their room, just like you have control over this courtroom. And the policy here, as the district court found, is to maintain order and to make sure that those interviews are being recorded. That those interviews are done properly, and the CCA has found that to accomplish those goals, they make the recording, nobody else. And that if you're somebody else and you're trying to do that, they're going to stop you. Now, again, if they keep it in their pocket and you don't know, I mean, if we don't know, we don't know. If we find out someone's doing it, it might be a situation like this where we say, okay, now hold on a second. You've been here before. We know you've done this because you broadcast it on Facebook. Don't record and talk to them about it. But, again, it goes back to that very much when it evolved to becoming an employment thing. And one thing we didn't really talk about... One real quick, your friend said that the same policy applies if it's someone outside the police force, so they bring in a witness to the encounter. Witness is not an employee. The same rules would apply. There's no difference. Is that right? That is correct. Okay. And I just want to make sure I understood that. I interrupted your train of thought now. So I didn't mean to. That's all right. It happens. Feels like being at home. Ultimately, end of the day, all the cases that they're relying on are about recording the police. That's in public. If we did these interviews on Fountain Square, by all means, come down, record anything you want. We're not going to stop you. But it's in a private interview setting. And as the district court found, the CCA's rules are rationally related to what they want to do, and they're rationally related to preserving their purpose. And the one thing that we didn't really talk about is, ultimately, what is the CCA's function here? And the CCA's function is to do an investigation and to ultimately make a recommendation. And if there's some type of finding, they find an officer who did something wrong, internal is also going to do a similar investigation, and ultimately this is going to work its way up to the city manager who would make the final employment decision if there is going to be any kind of discipline. You know, as I was thinking about this case and trying to think about why there would be this governmental interest in maintaining control of the recordings, I started to think about different scenarios. One scenario I came up with is, and as I said before, the person who is doing the recording, let's say the CCA is recording, and then I am making my own recording. I might, during that recording, go through an extemporaneous speech thing that puts me in a very positive light, record that, and then the other kind of negative things against me, I might not record that. If I rush out and put my recording in the ethos here first, I get high ground on that. And so that may be one of the things that they are concerned about. Is that a possibility or is that a scenario that bears, that's the wrong question. Is that part of the governmental interest that is considered here? That is one of the interests that the CCA had was having, again, control over what takes place in the room and how that information ultimately gets released. And I recognize there are a motion to dismiss stage. I have to take what they are saying is true about there being selective recordings. We obviously vehemently would fight that if we ever get to that stage. But again, to your point, yes, the opposite could happen here, where somebody else who comes in there could selectively record, and then before the lie gets around the world, before the truth puts its boots on, or whatever the phrase is. It's like that big headline that is erroneous, and then the correction is over on page 19. Okay. Ultimately, at the end of the day, as Judge Sutton, you point out, is there a First Amendment right to record? There simply isn't. And there is no case law that says that. Just one other question. It's only recording. They never film it, or do they sometimes film it? I'm assuming recording, you're just doing audio. Am I right about that assumption? With the CCAs recording, it's simply audio. And they don't vary from that? Because it's just interesting to think of the three possibilities. One would be camera with audio, audio, then notes. I'm just curious if they've ever used camera. To my knowledge, no. I can't tell you 100%, but to my knowledge, I've never seen a recorded CCA interview. I've only listened to them. I'm sorry? I'm sorry. I just checked with the person who does the employment side of things, and they are video recorded now, so now you would actually be able to watch it. The interviews today are? So they haven't asked for it here. They only want audio. They've not asked to video record. They asked to record. That, your interests are higher, because a picture is worth a thousand words and all that. But here it's just words. Okay. At the end of the day, there's not a First Amendment right, and without the First Amendment right, their entire case crumbles. As far as their allegations, maybe there's another path, but that path is not through the First Amendment. Thank you. So is your request only for audio, or is it to video as well? Either would be acceptable to us, Your Honor. Our goal is to make sure that we've got a complete recording that's out there for the public. That is our objective. But from the CCA standpoint, if somebody is recording, let's say on their iPhone, the CCA doesn't know whether it's audio only or whether it's video and audio or whatever, right? Certainly that's probably true. Of course, here I think the union president hit the record button and set it down on the table. Obviously if the table is only recording the black that's on the other side of it, then what it's picking up is the audio. So you're saying either, but if you prevail and we say it's okay to record, that is inclusive, unless we would specify that it's only one and not the other. That's true, Your Honor. Judge Murphy, you asked about employee speech. I wanted to address this. The city abandoned that argument explicitly in its reply brief at page 14, and obviously it was briefed below the Garcetti-Pickering issue. But their abandonment, I think, prevents discussion. Of course, then we can get into the... Does it matter? I mean, just to the proper... I agree that usually we would apply forfeiture principles. You don't generally forfeit the law, though, and we can't necessarily make bad law. I do think that it is significant in my mind, at least, that it's not a criminal ban or a civil... It's not the coercive use of government of ordinary individuals on the street. It is just the consequences, a condition on employment and a suspension or something to that effect. Well, and Your Honor, we didn't brief in the reply because they abandoned the forfeiture issues, but obviously we're dealing here with a blanket policy, and so when you look into the factors in Pickering and you look into the Janus case out of the U.S. Supreme Court, I think we are still dealing with core First Amendment rights here in light of the fact that we're dealing with, not as applied to particular employees speaking, but as a general policy matter. But you... The union would have no right, would they, to be at the witness interview, would they? They do. The individual, so... Okay, just to make sure I've got it right. So it's not an employee. It's a bystander. They call the bystander, and you do have a right to be there for that. Under the collective bargaining, they do, Your Honor. They have a right to be there, and there's three people typically in these officer interviews. There's the interviewer, there's the union representative, and then there's the officer that's the subject of the interview. And that gets me back to, and I know I'm brief on time, the city's asserted interests. Well, again, if the union president is the one that's doing the recording or taking the notes, that doesn't undermine their interest in maintaining order, right? Because that is allowing the interviewer to interact with the officer being investigated. So that's not undermined at all if the union president gets to take video. Improper broadcast, again, I think the city could appropriately prohibit the release of this until the city releases its own video or audio, as the case may be. I mean, just to make sure I'm understanding your theory, your theory is you get to do what they do. If they audio record, you audio record. If they video, you video, because that's the only way to really check them, I take it. That's correct. And I think, Your Honor, if you wanted to consider this as an access case, although I'm not sure that it is because they have access to the room and you look at the shark analysis, there is selective delimiting of the audience. They get to determine who gets an unvarnished copy of what actually occurred, right? And so when you look at that factor, that weighs against them. If you look at the stated interest, we've already talked about how that's undermined by other things that they allow, such as note taking or their own, and no prohibition on keeping this stuff secret. And reasonable relation, again, I don't think there is a reasonable relation to their asserted interest when you look at allowing somebody to record, not interrupt the interview, but just to record it and to hold it for a period of time, at least until the city releases the same information. Judge Donald, you asked the question about, well, what about the interest of the officers in possibly doctoring things the other way? And what I would say to that is, if the city is releasing a version and the officers are releasing a version and one of them has something that's in the recording and one of them doesn't, then we obviously know who was engaged in the doctoring. Thank you, Your Honors. All right, thanks to both of you for your helpful briefs and argument and for answering our questions, which we always appreciate. The case will be submitted.